District Court of the United States
Southern District of New York

-----------------------------------------------
|
(REDACTED),                              |        Case No. 1:25-cv-01777-MMG
       Plaintiff          |
|
vs.                                          |
|
(REDACTED)                               |
John Does 1-10, Jane Does 1-10,  |
       Defendants      |                **COMPLAINT**
|                **OF LIBEL AND SLANDER**
-----------------------------------------------

**CONTENTS**

    **REDACTED**

**Summary**

1. This is an action to obtain compensation for damages to the Plaintiff caused by the defendants **REDACTED**.

2. Plaintiff has been injured financially and socially, and in the destruction of his reputation and the humanitarian works of his life, by **REDACTED**

3. **REDACTED** have injured the Plaintiff by **REDACTED**

4. Having thereby lost **REDACTED** the Plaintiff demands very substantial compensation for damages.

**Note On Repetition Across Sections**

    Statements essential to several sections of fact or argument may be repeated therein to facilitate reading sections separately despite redundancy when reading the entire document. This has also proven necessary to discourage false claims of misinterpretation of fact and argument.

**Parties**

5. Plaintiff (REDACTED) (hereinafter "Plaintiff" **REDACTED**) is an engineer, philanthropist, and **REDACTED**. Plaintiff acts Pro Se, with experience in civil rights and racketeering litigation in the public interest.

6. The defendant publishers ("Publishers") **REDACTED** were (REDACTED), which now publishes REDACTED.[1]

7. Defendant (REDACTED) (hereinafter "Author", d. 4/2/2024) is **REDACTED**.

8. Defendant (REDACTED) (hereinafter "second wife") is the second wife of the Author since 1975, in her personal capacity, as the Author's Personal Representative in his will, and in her capacity of possession or handling of funds or other assets for the Author or his estate.

9. Defendant (REDACTED) Revocable Trust ("Trust") is an entity now or formerly involved in passing or retaining ownership of property of the defendants. Included under this name are all entities and persons now or formerly involved in possession, handling, or transfer of funds or other assets for the second wife or for the Author.

Parties To Be Joined As Needed:

10. Defendants John Doe 1-10 and Jane Doe 1-10 include all attorneys, witnesses, officials, and other persons who in this matter engage in perjuries of fact or law, deceptions, and other acts or omissions to prejudice or unfairly affect judgment, increase injuries, or reduce compensation.

11. **REDACTED**

---

[1] App. A Exhibits 1, 10: marketed on REDACTED website at REDACTED

**Statement Of Claims**

## COUNT I

The defendants have committed **REDACTED** injuring the Plaintiff, by **REDACTED** The said acts were made with full *knowledge* of the injury done, by *choice among alternatives*, and *without permission* of the Plaintiff, and have *caused major injuries* to the Plaintiff, for which the Plaintiff demands full compensation.

The said acts and injuries constitute **REDACTED** with specific damages, in violation of federal law, and of state law **REDACTED**.

By these interstate acts the defendants have interfered with interstate commerce conducted by the Plaintiff, in violation of federal law.

The acts of the defendants have also sought to deprive the Plaintiff of federal rights of property without due process of law, in violation of Amendment V of the United States Constitution, and in violation of the Civil Rights Act 42 USC § 1983-1985, and state rights of property, in violation of the constitutions of New York and Florida.

The facts, exhibits, and argument whereof are listed and incorporated hereunder.

| | |
|---|---|
| Appendices: | Appendix A:  Facts Of **REDACTED** |
| | Appendix B:  **REDACTED** |
| | Appendix C:  Defendant Motives **REDACTED** |
| | Appendix D:  Facts Of Damages |
| | Appendix E1 – E5:  Exhibits |
| | Appendix F1 – F5:  Email And Letters Of Plaintiff With Defendants |
| | Appendix G:  Timeliness Of The Complaint |

Memorandum of Law 1
Violations of Law:     Civil Rights Act 42 USC §§ 1981-1986
                                      18 USC §§ 1952–1968 (RICO) (see 18 USC §§ 1962 (c) and (d))
State Law
    New York
        New York, Civil Rights, Article 7 **REDACTED**
    Florida
        Fl. Stat. § 836.01, 836.02, 836.11: Crimes of concealing identities
        Fl. Stat. § 770.02, 836.08: **REDACTED**

## COUNT II

      The defendants (REDACTED), John Doe 1-5, and Jane Doe 1-5 have **REDACTED** caused **REDACTED** injury to the Plaintiff in his income, public interest activities, **REDACTED** quality of life, as well as the costs and delays of **REDACTED** litigation to obtain relief. The said acts were made with full *knowledge* of the injury done, by *choice among alternatives*, and *without permission* of the Plaintiff, and have *caused major injuries* to the Plaintiff, for which the Plaintiff demands full compensation.

      The said acts and injuries constitute **REDACTED** in violation of federal law, and of state law **REDACTED** listed below.

      By these interstate acts the defendants have interfered with interstate commerce conducted by the Plaintiff, in violation of federal law.

      The acts of the defendants have also sought to deprive the Plaintiff of federal rights of property without due process of law, in violation of Amendment V of the United States Constitution, and in violation of the Civil Rights Act 42 USC § 1983-1985, and state rights of property, in violation of the constitutions of New York and Florida.

      The facts, exhibits, and argument whereof are listed and incorporated hereunder.

Appendices:
    Appendix A:  Facts Of **REDACTED**
    Appendix B:  **REDACTED** Survey
    Appendix C:  Defendant Motives **REDACTED**
    Appendix D:  Facts Of Damages
    Appendix E1 – E5:  Exhibits
    Appendix F1 – F5:  Email And Letters Of Plaintiff With Defendants
    Appendix G:  Timeliness Of The Complaint

Memorandum of Law 1

Violations of Law:  Civil Rights Act 42 USC §§ 1981-1986
    18 USC §§ 1952–1968 (RICO) (see 18 USC §§ 1962 (c) and (d))

State Law
    New York
        New York, Civil Rights, Article 7 **REDACTED**
    Florida
        Fl. Stat. § 836.01, 836.02, 836.11: Crimes of concealing identities
        Fl. Stat. § 770.02, 836.08: **REDACTED**

**Jurisdiction And Venue**

    Jurisdiction is based upon federal issues and complete diversity.

    This court has jurisdiction under 28 USC §1332 (diversity of citizenship) of all claims herein, as all of the defendants are citizens or entities of different states.

    This district court has jurisdiction under 28 USC §1331 (federal issue) of the claims herein of interstate acts of interference with interstate commerce, and violations of Plaintiff rights to property guaranteed by the United States Constitution.

    This district court is a proper venue in this action, because the principal listed office of the defendant Publisher is located in this district.

**Authorities**

**Cases (referenced primarily in Memorandum of Law)**

    **REDACTED**

**Other Authorities**

    **REDACTED**

36. *Constitutional Remedies: A Reference Guide to the U.S. Constitution*, M. Wells, T. Eaton
37. *The Measure of Just Compensation,* K. Wyman, NYU

**SUMMARY OF FACTS**

1. **REDACTED**

**Facts Of The Plaintiff And His Philanthropic Work**

2. Plaintiff (REDACTED) is an engineer, philanthropist, and President of (REDACTED), a 501(c)(3) nonprofit corporation (hereinafter "School"), and has devoted his life since 1982 to humanitarian causes. Now retired, he is founding an institution to provide all citizens and legislators with summaries of carefully balanced expert debates of all policy issues, to improve public information and policymaking. From 1982 he labored to establish a charitable college preparatory school that would sponsor about 3000 orphans in the developing nations as pen pals of the school students, via existing charities such as Save The Children and Christian Children's Fund, to develop sympathy with other cultures among future leaders and professionals. He studied school foundings in their great variety, their varieties of administrative structures, the problems and technologies of building renovation, and the typical causes and prevention of school failures. In 1989 he established (REDACTED) as a nonprofit chritable corporation, and after years of searching and evaluating potential school facilities, in 1992 purchased a small former college campus in Maine ("School property" or "campus"), which he later donated to the school (see App. E1-E2 for description and plans).

3. The school campus, 20 acres with 63,000 sq. ft. of modern dormitory and classroom buildings, donated free and clear by the plaintiff, was one of the best opportunities in the history of school founding, and was ready for initial opening by 2000. The plaintiff had studied the history of school foundings and closures, planned thoroughly for downsizing during recessions, and was able to provide basic expenses from his engineering income to assist the early growth phase. The development plan proceeded well, and without opposition the school would have opened in 2000 after initial renovations. Litigation against hoods racing unmuffled ATVs on the adjacent nature trail with prohibitive noise of 92 –112 dBA delayed opening for several years.[2]

4. **REDACTED**
5. **REDACTED**
6. **REDACTED**

---

[2] **REDACTED**.

7. **REDACTED**
8. **REDACTED**
9. The Plaintiff has worked constantly and lived in humble circumstances with few luxuries for four decades to achieve these purposes, all of which labors were destroyed by attackers of the school, motivated by the defendants. Severe damages to the Plaintiff himself were caused, even beyond this greedy and perverse destruction of the labors, philanthropy, and purpose of his life. The Plaintiff thereby lost **REDACTED** lost the humanitarian works of his entire life, lost forty years of labor to support, renovate, and defend his school, **REDACTED**, and lost all recognition and ultimate reputation for his life of public service. The thousands of beneficiaries of his school have lost all opportunities for a better life for themselves and their own families. The defendants have a major debt to repay to humanity, as well as to the Plaintiff, to be allocated to his continuing public service work.

**Facts Of The Author And His Family**
*The Named Author*
10. **REDACTED**

*The Author's Second Wife*
11. **REDACTED**
12. **REDACTED**

**Facts Of REDACTED**
    **REDACTED**
**Facts Of REDACTED**
    **REDACTED**

**Facts Of Damages (see Appendix D for details of damages)**
    **REDACTED**

*Direct Damages Due From The Defendants*
    The direct damages are readily quantifiable; see Appendix D for details.

**REDACTED**

Plaintiff Damages Due To Interference With Professional Income

**REDACTED**

*Plaintiff Damages In The Destruction Of His Charity School*

13. For thirty years 1992-2022, the Plaintiff spent about six months annually at the School working more than full time in repairs, maintenance, security, and prosecution of those interfering with the school facility. See Appendix E1 for facts and exhibits of the School, Appendix E2 for exhibits of School renovations 1994-2002, and Appendices D, E3, E4, and E5 for facts and exhibits of the destruction of the School campus and Islands properties 2006-2020. Compensation for that labor alone would require about two-thirds of his engineering salary from acquisition to final sale of the school property (1992-2022), an average of over $100,000 annually for thirty years, a total now exceeding $3,000,000.

14. The value of the property lost is far greater than its cost to the Plaintiff. The school campus, 20 acres with 63,000 sq. ft. of dormitory and classroom buildings, donated free and clear by the plaintiff, was one of the best opportunities in the history of school foundings, and was ready for initial opening by 2000. Although sold for about $1,000,000 the property cannot be replaced for less than the cost of new construction, estimated at $16,000,000 less completion of renovations, because its combination of a harmonious ensemble of modern academic buildings, on 20 acres with wooded surroundings within range of major cities, will never again be available. This school-founding opportunity was due to a decade of tireless research by the plaintiff 1982-1992, which uncovered the related (REDACTED) bankruptcy caused by declining enrollments as the post-WWII baby boom passed through college, a situation which cannot be repeated.

*Destruction Of Lives Of 7500 Orphans Who Would Have Been Supported By The School*
    See Appendix D for details.

15. The School campus accommodated 353 students and was one of the best facilities ever available for school founding, at an ideal distance from population centers. A reasonable estimate of mature enrollment for a such a school in that location is 300 students. The Plaintiff purchase and donation of the campus and renovation costs eliminated fixed expenses, allowing the School to afford a major charity program of sponsoring ten orphans in developing nations per student,

communicating with students as a pen-pals, developing understanding and sympathy with other cultures as future leaders and professionals. The School would thereby sponsor 3000 orphans, each supported and educated for about ten years at residential schools operated by charities such as Save The Children Federation (SCF) and Christian Children's Fund (CCF). This program would have graduated 300 orphans annually from stable homes with a high school education.

16. After **REDACTED** the harassment and vandalism problem at the school became organized, with gang attacks by day and night with guns, clubs, axes, rocks, or concrete blocks. Frequent efforts to locate and destroy security beams and cameras required major efforts of repair and relocation. Within three years all buildings had been ransacked, destroying most doors, windows, baths, systems, plumbing, and wiring. Five vehicles were destroyed and one badly damaged, as well as three boats destroyed and three trailers damaged. At least three arson attempts were made, about 1500 rifle shots were fired from the adjacent nature trails, and one armed attack was made on the plaintiff's office by three riflemen who fled by car. See App. E3 exhibit 150 (map of crimes at school) and App. E3 – E5 for crime exhibits listed below. As a result of this organized crime, the School could not be opened.

17. The destruction of the School **REDACTED** has therefore annually doomed 300 children and their later families to lives of poverty, ignorance, malnutrition, and disease, a condemnation worse than death as seen by later generations. The total since the projected opening date of the school (2000-2025) is about 7500 lives destroyed, and 300 more lives destroyed every year. Reasonable compensation would therefore be no less than that made to the survivors of persons killed in preventable accidents and crime. Only the shared liability of other entities and persons limits compensation by these defendants for their deliberate and malicious destruction of a large charity.

**List Of Exhibits In Appendices (see Appendix E and F for exhibits)**

Exhibit No.    Appendix    Subject
**REDACTED**
Maps And Aerial Photos Of School Location (Appendix E1)
50             App. E1     *Map Of School Relative To Population Centers*
51             App. E1     *Map Of Coastal Routes To School Campus*
52             App. E1     *Map Of Town Of Sanford Showing* REDACTED
53             App. E1     *Aerial Of* REDACTED *Showing School Campus*
54             App. E1     *Aerial Of School Campus*
Photos Of Village And Region (Appendix E1)

9

| 60 | App. E1 | *Village Library and Church* |
| 61 | App. E1 | *Village Shopping And Waterfall* |
| 62 | App. E1 | *Nearby Coast And Lighthouse* |

Aerial Photos Of Buildings (Appendix E1)

| 70 | App. E1 | *Aerial Photos Of All Buildings* |
| 71 | App. E1 | *Aerial Photos Of Forbes Hall* |
| 72 | App. E1 | *Aerial Photos Of Hanscom Hall* |
| 73 | App. E1 | *Aerial Photos Of Pryor-Hussey Hall* |

Photos Of Buildings (Appendix E1)

| 80 | App. E1 | *Campus Entrance Under Construction* |
| 81 | App. E1 | *The Campus Drive* |
| 82 | App. E1 | *The Stream Through The Campus* |
| 83 | App. E1 | *Forbes Hall* |
| 84 | App. E1 | *Hanscom Hall* |
| 85 | App. E1 | *The Circle* |

Building Plans (Appendix E1)

| 90 | App. E1 | *Plans For Hanscom Hall* |
| 91 | App. E1 | *Plans For Forbes Hall* |
| 92 | App. E1 | *Plans For Pryor-Hussey Hall* |
| 93 | App. E1 | *Pryor-Hussey Hall Center Completion Plan* |

Building Renovations Before 2006 (Appendix E2)

| 100 | App. E2 | 1994 Forbes Hall Electrical Service Replacement |
| 101 | App. E2 | 1994 Forbes Hall Drainage Repairs |
| 110 | App. E2 | 1996 Underground Oil Tank Removal And Cleaning |
| 111 | App. E2 | 1996 Underground Oil Tank Removal And Cleaning |
| 112 | App. E2 | 1996 Underground Oil Tank Removal And Cleaning |
| 113 | App. E2 | 1996 Underground Oil Tank Removal And Cleaning |
| 120 | App. E2 | 1996-1999 Forbes Hall Wing Roof Edge Repairs |
| 121 | App. E2 | 1996-1999 Forbes Hall Wing Roof Edge Repair Completed |
| 122 | App. E2 | 1996-1999 Forbes Hall Wing Roof Repairs |
| 123 | App. E2 | 1996-1999 Forbes Hall Heavy Framing Repair At Valley |
| 124 | App. E2 | 1996-1999 Forbes Hall Roof Repairs |
| 125 | App. E2 | 1996-1999 Forbes Hall Roof Repairs |
| 126 | App. E2 | 1996-1999 Forbes Hall Roof Repairs |
| 127 | App. E2 | 1999 Forbes Hall Roof Repairs |
| 128 | App. E2 | 1999 Forbes Hall Roof Repairs |
| 129 | App. E2 | 1999 Forbes Hall Leftovers From 17 Tons Roofing |
| 130 | App. E2 | 1999 Forbes Hall Scrap Removal After Repairs |
| 131 | App. E2 | 1994 Pryor-Hussey Hall Original Condition With Flat Roof |
| 132 | App. E2 | 2002 Pryor-Hussey Hall New Gable Roof Structure |
| 133 | App. E2 | 2002 Pryor-Hussey Hall New Gable Roof Structure |
| 134 | App. E2 | 2002 Pryor-Hussey Hall New Gable Roof Structure Details |
| 135 | App. E2 | 2002 Pryor-Hussey Hall New Gable Roof Completion |
| 136 | App. E2 | 2002 Pryor-Hussey Hall Leftovers From 12 Tons Roofing |
| 137 | App. E2 | 2002 Hanscom Hall After Roof Replacement |
| 138 | App. E2 | 2002 All Roofs Replaced |

Building Renovations After 2007 (Appendix E2)

| | | |
|---|---|---|
| 140 | App. E2 | 2008 New Boiler Shed And Camera Controller |
| 141 | App. E2 | 2019 School Road Repairs |

Crimes At School 2006-2010 (Appendix E3)

| | | |
|---|---|---|
| 150 | App. E3 | 2006 and later Crimes at School Map |
| 151 | App. E3 | 2006-2008 Arson at Pryor-Hussey Hall |
| 152 - 156 | App. E3 | 2006-2008 Entrance gate destruction incidents 1, 2, 3, 4, and 5 |
| 160 | App. E3 | 2006-2008 Ransacking Of The School |
| 161 | App. E3 | 2006-2008 Forbes Hall ransacking 1 |
| 162 | App. E3 | 2006-2008 Forbes Hall ransacking 2 |
| 163 | App. E3 | 2006-2008 Forbes Hall ransacking 3 |
| 164 | App. E3 | 2006-2008 Forbes Hall ransacking 4 |
| 170 | App. E3 | 2006-2008 Hanscom Hall ransacking 1 |
| 171 | App. E3 | 2006-2008 Hanscom Hall ransacking 2 |
| 172 | App. E3 | 2006-2008 Hanscom Hall bullet holes |
| 180 | App. E3 | 2006-2008 Pryor-Hussey Hall ransacking 1 |
| 181 | App. E3 | 2006-2008 Pryor-Hussey Hall ransacking 2 |
| 182 | App. E3 | 2006-2008 Pryor-Hussey Hall ransacking 3 |
| 183 | App. E3 | 2006-2008 Pryor-Hussey Hall ransacking 4 |
| 184 | App. E3 | 2006-2008 Pryor-Hussey Hall ransacking 5 |
| 185 | App. E3 | 2006-2008 Pryor-Hussey Hall ransacking 6 |
| 186 | App. E3 | 2006-2008 Pryor-Hussey Hall ransacking 7 |
| 187 | App. E3 | 2006-2008 Pryor-Hussey Hall ransacking 8 |
| 188 | App. E3 | 2006-2008 Pryor-Hussey Hall ransacking 9 |
| 189 | App. E3 | 2006-2008 Pryor-Hussey Hall ransacking 10 |
| 190 | App. E3 | 2006-2008 Pryor-Hussey Hall ransacking 11 |
| 191 | App. E3 | 2006-2008 Pryor-Hussey Hall ransacking 12 |
| 192 | App. E3 | 2006-2008 Pryor-Hussey Hall ransacking 13 |
| 193 | App. E3 | 2006-2008 Pryor-Hussey Hall ransacking 14 |
| 195 | App. E3 | 2006-2008 Vehicles And Equipment Ransacking 1 |
| 196 | App. E3 | 2006-2008 Vehicles And Equipment Ransacking 2 |
| 197 | App. E3 | 2006-2008 Vehicles And Equipment Ransacking 3 |

Crimes At School After 2010 (Appendix E4)

| | | |
|---|---|---|
| 200-212 | App. E4 | 2018 Gang axe-attack at School |
| 230-233 | App. E4 | 2018 Vehicle attack at School |
| 268, 274 | App. E4 | 2019 Gang vandalism at School |
| 269-273 | App. E4 | 2019 Destruction of security beams and damage at School |
| 244 | App. E4 | 2019 Car vandalism |
| 261, 302 | App. E4 | 2019 Heavy car vandalism at School |
| 262, 320-321 | App. E4 | 2019 Destruction of boats and trailers at School |
| 305-313 | App. E4 | 2019 Destruction of 3 boats at School |
| 263 | App. E4 | 2019 Destruction of 3 boats at School |
| 323 | App. E4 | 2019 Destruction of 4 entrance landscape trees at School |
| 324 | App. E4 | 2020 Vandalism of Entrance Fence |
| 500-501 | App. E4 | 2021 Heavy Vandalism of boats and cars at School |
| 502 | App. E4 | 2021 Break-in and Vandalism of Hanscom Hall |

| | | | |
|---|---|---|---|
| 504a-504c | App. E4 | 2021 | Axe Attack On Car At School |
| 505a-505d | App. E4 | 2021 | Plow Attack On Boat At School |
| 509a | App. E4 | 2022 | Plow truck destroyed |
| 509b-509c | App. E4 | 2022 | Car destroyed |
| 511a-c | App. E4 | 2022 | Destruction at Pryor Hall |

Crimes At School Islands 2006-2020 (Appendix E5)

| | | | |
|---|---|---|---|
| 201 | App. E5 | 2006-2008 | Plans For Construction At Islands |
| 202 | App. E5 | 2004-2005 | Permits For Construction At Islands |
| 220 | App. E5 | 2006-2008 | Door And Roof Destruction And Break-ins |
| 225 | App. E5 | 2006-2010 | Guest House Piers As Built |
| 250 | App. E5 | 2006-2010 | Severe Bending Of Heavy Front Door Hasps |
| 251 | App. E5 | 2019 | Attempts To Pry Off Window Covers And Siding |
| 252 | App. E5 | 2019 | Break-ins With Battering Ram |
| 253 | App. E5 | 2019 | Break-ins With Battering Ram |
| 402-403 | App. E5 | 2020 | Damage To Docks |
| 405 | App. E5 | 2020 | Attempts To Pry Window Covers Causing Damage |
| 407-408 | App. E5 | 2020 | Attempted Break-ins By Prying Apart Siding |
| 410-412 | App. E5 | 2020 | Hasp Prying and Removal Of Survey Markers |

**SUMMARY OF ARGUMENT**

Full argument of the claims is presented in Memorandum Of Law 1.

**Introduction**

18. By the sixteenth century, common law courts provided for civil slander actions and developed the rules underlying modern American tort action for defamation.[3]

19. Defamation under common law[4] is *prima facie* where a statement, capable of being understood as defamatory by a substantial and respectable group, was communicated negligently or intentionally by the defendant. Eldredge notes that:

> Whether a person is lowered in the estimation of a respectable minority of the community is a fact, and such people may be 'respectable people' regardless of whether their neighbors look upon them as 'right thinkers' or 'wrong thinkers'.

20. The law of defamation has developed to deal with conflicts between freedom of speech and the right of individuals to protect their reputation from false, irresponsible or malicious publications.[5,6,7,8] This right has been sacrosanct in state courts, and any attempt to impugn a personal reputation is regarded with extreme disfavor.

**Criteria Of Defamation**

21. As noted in the *Restatement (Second) Of Torts* § 559 (1977): "A communication is defamatory if it tends so to harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him." Defamatory statements include false statements that have any of the following effects:

1. Reflect negatively on the plaintiff's character, morality, or integrity;
2. Expose a plaintiff to ridicule;
3. Claim that the plaintiff has a mental defect that would cause others to avoid association;
4. Suggest that the plaintiff was involved in a crime of moral turpitude or a felony; or
5. Impair the plaintiff's financial well-being.

---

[3] *The Law Of Libel And The Art Of Fiction*, Vivian Wilson, Law and Contemporary Problems, 1982
[4] *The Law Of Defamation,* L. Eldredge, (1978). note 38, § 9.
[5] *Time, Inc. v. Hill*, 385 U.S. 374, 388-89 (1967)
[6] *A Free And Responsible Press: A General Report On Mass Communication: Newspapers, Radio, Motion Pictures, Magazines, And Books*, The Commission On Freedom Of The Press (1947) ("*General Report*")
[7] *Gertz v. Robert Welch, Inc.,* 418 U.S. at 402-403 (1974)
See also *General Report, supra* at 130, 81. "Accountability, like subjection to law, is not necessarily a net subtraction to liberty. . . .The First Amendment was intended to guarantee free expression, not to create a privileged industry."
[8] *Id.* at 345.

22. Defamation, including libel, is defined by state courts[9] as "unprivileged publication of false statements which naturally and proximately result in injury to another,"[10] including that "which exposes a person to distrust, hatred, contempt, ridicule, or obloquy, or which causes such person to be avoided, or which has a tendency to injure such person in his office, occupation, business or employment."[11] All of these factors are involved in (REDACTED) except the accusation of crime. See this heading in Memorandum Of Law 1 for details.

### *Criteria Of Defamation Of Private Plaintiffs*

23. Under early U.S. common law, plaintiffs alleging libel were required to prove only that the publication was defamatory and referred to the plaintiff.[12] Without the defense of truth or privilege the publisher was subject to strict liability.[13] Beginning with *New York Times Co. v. Sullivan*[14], decisions of the U.S. Supreme Court established federal standards for plaintiffs in defamation actions, superceding common law. Proof of malice for private plaintiffs was replaced by the negligence standard. The U.S. Supreme Court in *Gertz v. Robert Welch, Inc.*,[15] withdrew any *New York Times* constitutional protection of a publication that defames a private plaintiff, who must establish only that it was published with negligence in order to recover damages. Because private individuals have fewer means than public figures to rebut attacks on their reputation, the Court considered them more deserving of protection than public figures.

24. State courts have followed the liability standards established by the U.S. Supreme Court in defamation actions by private individuals, and have recognized the high value society places on the reputational interests of the private individual.

25. Under New York State Law,[16] defamation consists of:

   (1) A false statement made by the defendant,
   (2) published to a third party without authorization,
   (3) with fault amounting to at least negligence of the defendant, and
   (4) which constituted "defamation per se" or caused special harm.

---

[9] *Florida Defamation Law And The First Amendment: Protecting The Reputational Interests Of The Private Individual*, Joseph Kent Brown, Florida State University Law Review
[10] *Wolfson v. Kirk*, 273 So. 2d 774, 776 (Fla. 4th DCA 1973).
[11] *Briggs,* 46 So. at 330.
[12] *Campbell v. Jacksonville Kennel Club*, 66 So. 2d 495 (Fla. 1953); *Tip Top Grocery Co. v. Wellner*, 186 So. 219 (Fla. 1938); *Commander v. Pedersen*, 156 So. 337 (Fla. 1937).
[13] See *Restatement Of Torts* § 578 (1938)
[14] *New York Times Co. v. Sullivan,* 376 U.S. at 285-86 (1964)
[15] *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 343-44 (1974)
[16] *Dillon v City of New York*, 261 AD2d 34, 38, 704 NYS2d 1 (1999)

26. Defamation exists wherever statements are "susceptible of a defamatory connotation"[17] and fault exists where the defendant knew or should have known that the statement was false.

27. Libel *per se* consists of language that itself brings one's character into ridicule or contempt, or injuriously affects one's trade or profession, which is *presumed* to injure another in their business or reputation. In libel *per se*, malice is presumed, and damages are recovered without allegation or proof of special damages.[18]

28. Statements which are defamatory *per se* include those which injure one's personal or professional reputation, such as statements that (1) impute inchastity or sexual misconduct; (2) expose a person to ridicule or contempt; (3) call into question financial responsibility or reliability; or (4) affect business, office, trade, or profession, later extended[19] to (5) statements of any kind of "unfitness," including (6) language that may imply a "disgraceful" state.

29. Defamation, including libel, is defined by the Florida courts[20] as "unprivileged publication of false statements which naturally and proximately result in injury to another,"[21] including that "which exposes a person to distrust, hatred, contempt, ridicule, or obloquy, or which causes such person to be avoided, or which has a tendency to injure such person in his office, occupation, business or employment."[22] The elements for a cause of action and liability for defamation in Florida are the same as those of New York:

>  (1) a false and defamatory statement concerning another;
>  (2) an unprivileged publication to one or more third parties;
>  (3) fault amounting at least to negligence on the part of the publisher; and
>  (4) actionability irrespective of damages caused, or special harm shown.

30. **REDACTED**
   See Memorandum Of Law 1 for further detail.

**Identification Of REDACTED**

*Standard Of Judgment For Identification* **REDACTED**

   **REDACTED** See this heading in Memorandum Of Law 1 for further detail.

---

[17] *Davis v. Boeheim*, 110 A.D.3d 1431 (N.Y. 2014)
[18] *Defamation*, Danel Singer Law PLLC, https://www.dasingerlaw.com/defamation.html
[19] *Four Star Stage Lighting v. Merrick*, 56 A.D.2d 767, 768 (N.Y. App. Div. 1977)
[20] *Florida Defamation Law And The First Amendment: Protecting The Reputational Interests Of The Private Individual*, Joseph Kent Brown, Florida State University Law Review
[21] *Wolfson v. Kirk*, 273 So. 2d 774, 776 (Fla. 4th DCA 1973).

*Application Of The Standard* **REDACTED**

  **REDACTED**

**The Intent Of Defamation**

*Standard Of Judgment*

**REDACTED**

31. The intent to defame is inferred from the defamatory details. In *Corrigan v. Bobbs Merril, Co.*[23] **REDACTED** strict liability was imposed on the publisher.

  **REDACTED**

*Application Of The Standard To The Case*

  **REDACTED**

See this heading in Appendix C and Memorandum Of Law 1 for further details.


**Addendum: Timeliness Of Complaint**

  Fact and argument dismissing any false claim of laches are presented in Appendix G.

  **REDACTED**

*Standard And Argument Of Timeliness*

32. The defense of laches is applicable only to claims for equitable relief such as injunction, not to claims for legal relief such as damages. Laches consideration evaluates the reasonableness of delaying litigation in a particular situation, and the equitable conduct of the plaintiff, and so is case-specific. Laches is found only in egregious cases of unreasonable and unexplained delay.

33. Each of the following elements is required to assert a defense of laches:

  1. Delay in bringing action after the Plaintiff knew or should have known of the offense;
  2. The delay is "unreasonable;" *and*
  3. The delay prejudices the defendant.

34. Courts have recognized the following causes of delay as reasonable:[24]

  1. Lack of full information about the defamation;
  2. Need to exhaust remedies through private or administrative process;
  3. Evaluation and preparation of a complicated claim; and
  4. Determination whether the damages will justify the costs or damages of litigation.

---

[22] *Briggs,* 46 So. at 330.
[23] *Corrigan v. Bobbs Merril, Co.,* 228 N.Y. 58, 126 N.E. 260 (1920).
[24] *Danjaq LLC MGM UA v. SONY Corporation*, 773 F.Supp. 194 (C.D. Cal 1991)

35. A claim of unreasonable delay must show that it caused prejudice to the defendant by:

    1. Loss of evidence favorable to the defendant;
    2. Death or disability of witnesses more favorable to the defendant; or
    3. Economic damage to defendants avoidable if the lawsuit were filed earlier.

36. In this case, the delay in litigation meets all four independent criteria of reasonable delay, and none of the criteria of unreasonable delay or damage to the defendants, all of which are required.

    **REDACTED**

Therefore each independent cause of delay in this litigation is recognized as reasonable.

37. Further, it was clear that no prejudice to the defendants could be caused by such a delay:

1. Any claim of loss of evidence favorable to the defendant is unsupportable, because

    **REDACTED**

2. Death or memory loss of witnesses favorable to the defendant did not occur, because:

    **REDACTED**

3. No economic advantage to the defendants would have occurred if the lawsuit were filed earlier, and in fact the delay unfairly benefited the defendants and cost them nothing. Therefore no prejudice to the defendants was caused by the necessary delay in litigation.

38. **REDACTED** The delay was therefore "reasonable" and **REDACTED** in no way reduced the evidence or caused any economic harm to the defendants, and therefore did not prejudice the defendants. **REDACTED** None of the required elements of laches are present in this case.

    For detailed fact and argument dismissing any claim of laches see Appendix G.

**PETITION FOR RELIEF**

39. The Plaintiff respectfully petitions this Court for declaratory judgment, and compensation for damages, in accordance with the facts and argument set forth in Appendix D and Memorandum Of Law 1, summarized below.  An order shall be provided with appropriate detail.

*Damages To The Plaintiff*

$ 　　660,000　(minimum) Damages to the Plaintiff by loss of professional income
　　　　　　　　　(loss of 25 to 50% higher income with typical promotions over 20 years)
　3,000,000　(minimum) Damages to the Plaintiff related to destruction of his charity school
　　　　　　　　　(loss of campus work about 6 months per year, at his salary rate over 40 years)
　　TBD　　　Loss of **REDACTED**
10,000,000　Damages to the Plaintiff by **REDACTED**
10,000,000　Damages to the Plaintiff by loss of ultimate recognition and reputation
**$23,660,000  Total damages to the Plaintiff (plus REDACTED TBD)**

*Damages To Beneficiaries Of The Plaintiff's School*

　　　　The defendants have a major debt to repay to humanity, as well as to the Plaintiff.

$7,500,000,000  Destruction of the lives of 7,500 orphans otherwise supported by the School
**$7,523,060,000  Total direct damages caused by defendants**

　　　　(To this amount is added $300,000,000 annually for losses of later school beneficiaries)

　　　　All damages may be paid to the Plaintiff's nonprofit corporation, **REDACTED** to be used for purposes in the public interest. Amounts paid directly to the Plaintiff are subject to capital gains tax, which must be added to the damages so that the net loss to the Plaintiff is compensated.

**OATH**

I do solemnly swear that all statements of fact in the foregoing document are true and correct to the best of my knowledge and belief, and that a true copy thereof ~~has been~~ *SHALL BE* served ~~as~~ as below to each defendant.

Date: 2/27/2025

(REDACTED)

**Defendant Address List**

(REDACTED)

**Certificate**

The above-named (REDACTED) appeared before me and stated that the foregoing document is his free act and deed.

Before me    (REDACTED)